UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Doris C. Brown,<br><br>            Plaintiff,<br><br>v.<br><br>State Farm Fire and Casualty Company,<br><br>            Defendant. | C/A No.     3:25-cv-13575-MGL<br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

      When Hurricane Helene blew a huge oak tree onto Plaintiff Doris C. Brown's home, puncturing the roof and causing massive damage to the structure and contents therein, Brown filed a claim on her homeowner's insurance policy with Defendant State Farm Fire and Casualty Company to get the money she needs to repair the structure and replace the contents. But for 14 months, State Farm has conducted no diligent investigation of the loss, provided no meaningful claims service, refused to accept the full scope of the loss, and bandied Brown to and from *eight* different adjusters. Brown's home—once a refuge on Lake Murray where the elderly grandmother intended to live out her remaining years and care for her disabled granddaughter—remains in shambles with no resolution of her claim in sight. Now, the coverage that provides Brown and her granddaughter with temporary housing assistance is running out, presenting her with an impossible choice: accept State Farm's bad-faith estimate of her loss to get *some* money or continue fighting for what she is owed and risk being homeless when temporary housing assistance runs out.

      A good neighbor is someone you can call for help in a pinch. State Farm is anything but. Brown now brings this breach of contract and insurance bad faith action against State Farm to recover actual and consequential damages that she has suffered along with punitive damages in an

amount sufficient to punish the insurer and impress upon it the wrongfulness of its actions. Brown would respectfully show unto the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Doris C. Brown is a citizen of South Carolina and owns the home located at 183 Rocky Ridge Road, Leesville, South Carolina (the "Home").

2. Defendant State Farm Fire and Casualty Company (State Farm) is a for-profit corporation believed to be incorporated under the laws of the State of Illinois with its principal place of business in Illinois. At all times relevant to this action State Farm acted through its adjusters, claims managers, inspectors, and agents.

3. The Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

4. Venue is proper in this District and Division because the acts and omissions that give rise to the action occurred in Lexington County, South Carolina.

## FACTS

5. The Home is a 1,600 square foot structure with three bedrooms and two bathrooms that Brown and her late husband, James F. Brown, purchased in October 2006 as joint tenants with a right of survivorship.

6. Prior to Hurricane Helene, Brown lived in the Home with her son and disabled adult granddaughter.

7. At all times relevant to this action, the Home was insured by State Farm through Policy No. 40-EV-0428-3 (the "Policy") which, upon information and belief,[1] provides (in relevant

---

[1] Brown has repeatedly requested that State Farm provide her with a full copy of her insurance policy. In response, State Farm's agent merely sent her the "declarations page," *not* the full policy as requested. When Brown's counsel demanded a full copy of the policy, Adjustor Number 8 (see

part) for $358,700 in protection to the Dwelling and $35,870 for Other Structures (collectively, "Dwelling Coverage"), $269,025 in protection for personal property loss (Personal Property Coverage), and $107,510 in loss of use or Advanced Living Expense (ALE) Coverage.

8. At all times relevant to this action, Policy premium was timely and fully paid and the Policy was in effect such that Brown and State Farm had a legal, binding, and enforceable insurance contract.

9. On September 26, 2024, Hurricane Helene passed through South Carolina's Midlands region, including Lexington County.

10. During the storm, trees, including a large oak tree, fell on the Home, penetrated the roof, destroying her fence and dock, and causing severe damage to the Dwelling.

11. Plaintiff is disabled and uses a wheelchair and walker for mobility.

12. At the time of the loss, Brown was asleep in her bedroom and was trapped when tree limbs pierced the ceiling on either side of her bed, opened a massive hole in the roof, and left her unable to escape until her son rescued her.

13. On September 27, 2024, Brown gave State Farm notice of the loss.

14. State Farm acknowledged notice of the loss and opened Claim No. 4074L904J (the "Claim").

15. State Farm has done nothing to help Brown mitigate the loss.

16. It failed to hire a tree removal company or provide Brown with a vendor list.

17. It failed to hire a tarping company or provide Brown with a vendor list.

---

below) said it would be "requested" from State Farm's underwriting department and would take up to two weeks to receive a copy.

18. It failed to have the home packed out to save as many of the contents as possible or to approve and pay for construction to get the home dried in as quickly as possible.

19. State Farm's adjustors have done nothing to meaningfully adjust and pay the Claim.

20. Instead, Brown has been left to manager with insufficient resources from State Farm to hire contractors to perform essential salvage, demolition, and reconstruction work.

21. Adjuster James Wesley was the first adjuster assigned to the Claim.

22. On October 2, 2024, Brown received a proposal from Alpine Tree Care, LLC for $30,000 for tree and debris removal work.

23. However, this work was not performed until around Thanksgiving 2024, because after doing nothing to help Brown find the contractor, State Farm intervened, disputed the $30,000 estimate, and is believed to have re-negotiated the price to $20,000.

24. On October 5, 2024, Wesley did a brief inspection of the Home by using a ladder to peer inside the hole in the roof with the tree still inside the Home.

25. Wesley stated to Brown he did not believe the Home could be repaired—i.e., that it was a total loss—but that he did not have the authority to determine that.

26. Wesley told Brown that he would return in a week with an engineer to determine if the house was structurally safe.

27. Wesley did not return with an engineer as promised.

28. In fact, State Farm never retained an engineering firm to inspect the Home.

29. Instead, Wesley returned the following week with his supervisor to conduct another inspection of the Home.

30. Meanwhile, State Farm did not assist Brown with finding comparable temporary housing; Wesley merely asked if she had somewhere she could go and did not present Brown with any options that might meet her needs.

31. With nowhere else to go, Brown moved into her daughter's house from September 27, 2024, until August 23, 2025.

32. Brown's daughter's home is not wheelchair accessible, so Brown (79 years old) had to carefully navigate the stairs each morning and night to access a bedroom, causing extreme pain to her knees and back.

33. On three separate occasions, Brown fell while attempting to navigate her daughter's home, requiring medical care on one occasion.

34. Brown also had nowhere to house her three dogs due to her daughter already having multiple pets in her home.

35. Brown was left with no choice except to board her dogs, but one of the animals could not handle the stress of boarding and had to be put down.

36. After several months of incurring $2,400/month boarding fees, Brown gave away one of the dogs and sent her remaining dog to be cared for by her son.

37. On October 21, 2024, Wesley issued a Personal Property advance payment to Plaintiff for $5,000—the first such payment on the Claim.

38. On November 7, 2024, Wesley submitted a "Summary for Coverage A – Dwelling – 35 Windstorm and Hail", claiming the loss was just $92,399.89. At the time this estimate was completed, the tree was still on the Home, and the Home was inaccessible.

39. Also on November 7, 2024, Wesley issued a $6,700 ALE payment to Brown and a check for $77,093.95 made out to Brown and her mortgage company, Carrington Mortgage.

40. Notably, the $77,093.95 made payable to Brown and Carrington Mortgage included a substantial deduction for depreciation and did not give Brown the benefit of Replacement Cost Benefits under the Policy.

41. This practice of substantial, unjustified depreciation diminished the funds Brown would have (even once released) to begin work on salvage, demolition, and reconstruction.

42. On or around November 2024, Brown hired her own contractor, Mike Gibson of Palmetto Design & Renovation Contractors, LLC.

43. On or around Thanksgiving 2024, the tree was finally removed by the contractor Brown hired. A contractor she retained also placed a tarp over the hole in the roof.

44. All this time, the Home and its contents were exposed to the elements, causing further damage.

45. Brown needed money to pay for the tree removal, but State Farm insisted those funds come from the money already signed over to Carrington Mortgage.

46. Carrington Mortgage refused to release the money, believing the funds it held were provided to repair the Home, and requiring Brown to complete some percentage of the work and have the work approved by an inspector before disbursing any funds to her. Eventually, Carrington Mortgage relented and released funds to pay for the tree removal, but this delayed work.

47. Repairs to the structure were not possible until mitigation was complete.

48. Brown did not have the expertise or funds to plan this mitigation work.

49. On December 6, 2024, Gibson submitted a scope of $404,485.47 for the Dwelling repairs that would repair the house, fence, and dock—all of which were damaged.

50. Gibson also submitted an estimate of $52,298.37 for debris removal, pack out, and contents cleaning.

51. On December 17, 2025, Gibson provided his estimate to Adjuster Micha Hulin Vaeodn (#2) and asked Vaeodn to meet him at the Home so Brown could get "something started."

52. That same day, on December 17, 2024, Wesley updated State Farm's Dwelling repair estimate to $108,547.41.

53. Also on December 17, Adjuster Trent Rogers (#3) issued a Dwelling payment of $12,486.26 for "Tarp and O&P" to Brown and Carrington Mortgage.

54. That same day, the Summary of Loss for the Claim was updated to increase the covered tree debris removal to $995.

55. On December 31, 2024, State Farm sent a letter to Brown stating that her Claim had been reassigned to Adjuster Andrew Yborra (#4).

56. On January 4, 2025, Yborra issued an ALE payment of $490 for pet boarding.

57. On January 16, 2025, State Farm issued an additional ALE payment for $17,022 for the rest of the dog kennel invoices from November to the end of January.

58. No further ALE funds were paid to Brown for four months.

59. On January 29, 2025, Carrington Mortgage issued a $1,975 check to Peak Exteriors for tarping the Home.

60. On February 6, 2025, State Farm requested Brown's Personal Property inventory.

61. Brown had not completed a Personal Property inventory because her belongings were still in the Home, which was inaccessible due to the considerable debris still hanging from the open roof and unsound condition of the structure.

62. On March 11, 2025, Gibson met Adjuster Dave Miller (#5) at the Home for yet another State Farm inspection. During the inspection, Gibson noted the need for an asbestos

inspection and abatement and the need for approval for demolition and contents salvage, removal, and storage, during which Gibson would inventory non-salvageable contents.

63. State Farm had no desire to participate in salvage and agreed to defer to Gibson's evaluation of the salvage as his team cleared the structure and threw out non-salvageable items.

64. In a follow up email on March 11, Gibson requested a $15,000 advance payment to begin this work and stated, "I can mobilize later this week."

65. On March 13, 2025, Miller acknowledged receipt of Gibson's email and claimed that State Farm had issued actual cash value (ACV) payment to Brown and suggested that those funds be used for the deposit, "otherwise [Miller would] issue a payment after [his] return on the 20th of March."

66. Gibson responded that same day and explained that Carrington Mortgage was holding the ACV funds ($77,093.95 on Nov. 7, 2024, for the "Building" and $12,486.26 on Dec. 17, 2024, for "Tarp and O&P") and that "I don't suspect they [Carrington] will release structure related money to do the contents work."

67. Gibson explained that Brown was caught in "a terrific down[ward] spiral towards a financial disaster" on account of State Farm's lack of structure funding that would allow sufficient funds to be released to begin work.

68. Aside from the $5,000 payment on October 21, 2024, State Farm had not issued *any* Personal Property payments to fund salvage work. Gibson explained that the contents work "**needs to be done asap**" (bold original) and requested an advance payment of $50,000 toward Personal Property to engage a textile restoration vendor to help with salvage.

69. In fact, Miller never responded or issued payment when he returned to the office on March 20, as promised. Eventually, he was replaced by another adjuster.

70. On March 21, 2025, Brown spoke with a Carrington Mortgage representative who stated that the mortgage company wanted to conduct an inspection before funds were released.

71. The tree had been removed and the tarp placed on the roof months ago, but Carrington Mortgage never bothered to conduct a timely inspection.

72. With Brown needing additional money to move the project forward, the mortgage company refused until they inspected the work.

73. This inspection finally occurred on April 1, 2025, resulting in Carrington Mortgage releasing $22,815.11 to Gibson's company on April 21, 2025.

74. On April 6, 2025, Brown submitted Gibson's scope for damage to her fence and dock to Carrington Mortgage and State Farm.

75. On April 7, 2025, Miller sent Brown a letter requesting the following information:

    a. Confirmation of type of asbestos testing performed by Gibson's company;

    b. A rental agreement between Brown and her son; and

    c. The number of people living in the temporary housing.

76. Concerning contents, the April 7 letter explained that State Farm would "owe to clean, then repair, then replace[ ] each item per the policy provisions."

77. On April 17, 2025, Carrington Mortgage finally issued a check for $22,815.11 to Gibson's company for debris removal, pack out, and salvage.

78. On April 24, 2025, Brown spoke with the office manager for her local State Farm agent, and complained that she had not heard from Miller (#5) with an updated loss estimate since he inspected the Home on March 11, and that she felt "totally abandoned by all parties involved."

79. Brown also reported that Carrington Mortgage was refusing to disburse additional funds without State Farm's authorization. Instead of working to give the mortgage company the

needed assurance, the agent's office manager told Brown she should get a lawyer to "go after" her mortgage company.

80. On May 6, 2025, salvage and pack out finally began and continued through July 30, 2025.

81. Due to the length of time her belongings were exposed to the elements, many of Brown's possessions were now unsalvageable.

82. On May 24, 2025, Adjuster Anthony Truitt (#6) issued an ALE payment of $16,500 for Brown's rent and pet boarding costs for February–April 2025.

83. On July 25, 2025, Adjuster Jacob Spencer (#7) issued three payments to Brown:

   a. $15,978 in ALE for May–July 2025;

   b. $20,819.56 for Personal Property pack out costs; and

   c. $139,034.94 for Dwelling payment for repairs.

84. Brown did not agree with State Farm's adjustment of the Dwelling loss and did not cash the $139,034.94 check because it was woefully inadequate to repair her Home.

85. Spencer also apparently amended State Farm's November 7, 2024, estimate of just $92,399.89 to reflect the amount on the check sent to Brown.

86. State Farm canceled and re-issued the check several times in an effort to get Brown to accept it as the final Dwelling payment.

87. Meanwhile, Brown ran out of funds to pay Gibson to complete salvage work, so boxes of her possessions were left on the Dwelling's back porch.

88. On September 3, 2025, Gibson provided an updated scope of $43,019.88 for pack out and content cleaning work completed thus far. Gibson had only received $22,815.11 thus far

and told Brown he needed an additional $20,204.77 to complete the work and requested an advance payment of $5,000.

89. Additionally, on September 3, Gibson created a more comprehensive scope for $56,246.51 that added the cost of contents cleaning to the prior $43,019.88 scope.

90. Gibson also finalized his report cataloging Brown's non-salvageable inventory.

91. The inventory price list was not complete, because Gibson ran out of funds; however, the partial personal property inventory totaled $73,325.36.

92. Gibson took and transmitted 2,742 images and video and created a spreadsheet of 1,082 non-salvageable items.

93. On September 5, 2025, Gibson submitted to State Farm the partial non-salvageable inventory and the two scopes he prepared.

94. On September 8, 2025, Adjuster Laura Rader (#8) responded by requesting Gibson separate charges for contents from structure demolition and remove his supervision fees and many other line items from the invoice.

95. On September 9, 2025, Gibson refused as the report was already separated by each category of work.

96. On September 12, 2025, Rader issued a supplemental payment of $2,275.37 for pack out and contents cleaning and labeled it as a purported "settlement" of the Personal Property portion of the Claim.

97. On September 16, 2025, Gibson emailed Rader detailing the timeline of the minimal assistance State Farm offered Brown on her Personal Property Claim, including his discussions of the contents handling with four different adjusters, two of whom he met on site.

98. Meanwhile, Gibson had attempted to get State Farm's approval to retain contents cleaning services but had not received a response months later.

99. On September 18, 2025, with the salvage work still stalled, Brown paid Gibson company $18,000 of the $20,819.56 in Personal Property funds so work could continue.

100. That same day, Gibson emailed State Farm noting that Brown had made the payment of funds allocated for another purpose and that a balance of $5,018.11 remained for the pack out and contents cleaning.

101. On September 23, 2025, Gibson emailed State Farm and attached another copy of his estimate and requested a $100,000 advance to begin work on drying-in the Home.

102. On September 25, 2025, State Farm issued an ALE check of $6,367 for August 20–30, September, and October temporary housing fees.

103. On October 1, 2025, Rader responded to Gibson's email stating, "Please submit photos of any additional damages to warrant your supplement."

104. State Farm already had hundreds of photos from multiple inspections and estimates on a Claim pending more than a year.

105. On November 3, 2025, State Farm sent Brown a letter with a check for $21,250.07 purporting to be a "supplement for the reconciling of State Farm Estimate and Palmetto Design's estimate for rebuild in settlement of your Dwelling claim[.]"

106. Enclosed with the letter was yet another estimate, now claiming State Farm values the Dwelling loss at $317,409.22.

107. This latest so-called estimate is more than three times State Farm's initial estimate some 11 months earlier.

108. After more than a year of delays, stair-stepping the loss value, and no meaningful claims service whatsoever, Brown still lacks sufficient funds to proceed with rebuilding her Home and is fearful that her ALE coverage will soon be exhausted with nowhere for her and her disabled granddaughter to go.

109. This suit followed.

## FOR A FIRST CAUSE OF ACTION
### Breach of Insurance Policy

110. Each of the paragraphs above are incorporated here as if stated verbatim.

111. The Policy imposed contractual and legally binding obligation on the parties, whereby Brown agreed to pay premium in exchange for the insurance coverages described above and a promise that State Farm would timely adjust and pay claims.

112. Implied in the Policy is the implied duty of good faith and fair dealing that exists in every legally binding contract in this State.

113. Brown suffered losses covered by the Policy.

114. Instead of fulfilling its obligations under the Policy, State Farm breached the Policy in one or more of the following ways:

    a. Failing to act in good faith;

    b. Failing to timely investigate and adjust the Claim;

    c. Failing to cooperate with and assist Brown with the claims process;

    d. Failing to compensate Brown for damage State Farm caused during its prolonged and untimely adjustment of the Claim;

    e. Failing to offer and provide contractually required benefits;

    f. Failing to provide contractually required claims service;

    g.    Failing to make contractual payments to compensate for the loss of the Dwelling and Personal Property; and

    h.    In other ways as may be shown during discovery.

115.    Because State Farm breached the Policy, Brown is entitled to recover all actual and consequential damages including, but not limited to, the full value of the Policy.

## FOR A SECOND CAUSE OF ACTION
### Bad Faith Refusal to Pay

116.    Each of the paragraphs above are incorporated here as if stated verbatim.

117.    State Farm has acted unreasonably and in bad faith while handling Brown's Claim by engaging in one or more of the following:

    a.    Providing no claims service in identifying a tree and debris removal and tarping service;

    b.    Failing to have the Home packed out within 72 hours;

    c.    Failing to timely approve covered services for payment;

    d.    Failing to conduct a reasonable investigation to establish damages compensable under the Policy;

    e.    Demanding repeated inspections of the Dwelling without materially advancing the Claim;

    f.    Failing to timely remediate moisture damage caused by the Home's prolonged exposure to the elements;

    g.    Bandying Brown from adjuster to adjuster, effectively starting the claims process over each time;

    h.    Assigning adjusters to Brown's claim with insufficient authority to adjust the loss and settle the Claim;

i. Failing to timely respond to Brown and her contractor;

j. Failing to make a prompt, fair, and equitable settlement of the Claim;

k. Repeatedly offering Brown settlement funds dramatically less than what is reasonable considering the scope of the loss;

l. Dramatically depreciating the value of Brown's property in an unreasonable manner and/or contrary to Policy terms;

m. Delaying the claims process to wear-down and degrade Brown and coerce her into accepting less than fair value for her Claim;

n. Failing to communicate with Brown's mortgage company to ensure funds are released for repair work;

o. Failing to timely provide Brown, upon her request, with a full copy of her insurance Policy;

p. Requiring Brown to instigate this lawsuit to recover amounts reasonably owed under the Policy;

q. Requiring Brown to incur attorneys' fees and litigation costs knowing it will diminish the money she needs to repair the Home;

r. Violating the S.C. Code Ann. § 38-59-20(2)–(6), (8), of the South Carolina Claims Practices Act; and

s. In other such ways as may be shown during discovery.

118. State Farm has acted and continues to act unreasonably and in bad faith in breach of the implied covenant of good faith and fair dealing implicit in the Policy and to the detriment of its insured, to whom it owed that duty.

119. State Farm's conduct has caused Brown to sustain actual and consequential damages she is entitled to recover including:

    a.    Unpaid benefits on the Dwelling and Personal Property claims;

    b.    Out of pocket costs to mitigate losses to the Home;

    c.    Out of pocket costs to evaluate the damage and repair the Home;

    d.    Out of pocket and unreimbursed living expenses;

    e.    Depression, suffering, and emotional harm;

    f.    Attorneys' fees and costs in bringing this action; and

    g.    Other damages that may be shown during discovery.

120. State Farm's conduct is in willful, wanton, and reckless disregard of Brown and her rights under the Policy, and her wellbeing such that Brown is entitled to an award of punitive damages to punish State Farm and impress upon it the wrongfulness of its actions.

## FOR A THIRD CAUSE OF ACTION
### Breach of Contract Accompanied by Fraud

121. Each of the foregoing paragraphs are incorporated here as if stated verbatim.

122. In breaching the Policy, State Farm had fraudulent or wrongful intent, as evidenced by one or more of the acts set forth in Paragraph No. 117 above.

123. Because of State Farm's wrongful conduct in breaching the Policy, Brown is entitled to recover actual and consequential damages to compensate them for their losses and punitive damages to punish State Farm and impress upon it the wrongfulness of its actions.

## SECTION 38-59-40 DEMAND

124. Pursuant to S.C. Code Ann. § 38-59-40(1), this constitutes a written demand by Brown for payment of the Policy limits on the Dwelling and Personal Property coverage, the payment of which shall <u>not</u> constitute a compromise of this action, waiver of Brown's right to

recover any sum demanded herein, or moot any other claim or cause of action that would allow Brown to recover in excess of the Policy limits.

## JURY DEMAND

125. Brown demands a trial by jury on all claims so triable.

## PRAYER

**WHEREFORE**, Brown respectfully prays for judgment against State Farm for all actual, consequential, and punitive damages, in an amount to be determined by a jury at the trial of this matter, along with all attorneys' fees, costs, and pre-judgment interest permitted by law, and for such further relief as the Court deems just and proper.

Respectfully submitted,

Tobias Gavin Ward , Jr. (Fed. ID No. 4520)
J. Derrick Jackson (Fed. ID No. 5836)
TOBIAS G WARD JR. LAW FIRM
PO Box 50124
Columbia, SC 29250
803-708-4200
tw@tobywardlaw.com
dj@tobywardlaw.com

s/Christopher P. Kenney
Christopher P. Kenney (Fed ID No. 11314)
CHRIS KENNEY LAW
808 Lady Street, Suite D7 (29201)
Post Office Box 1377
Columbia, SC 29202
(803) 546-3695
cpk@chriskenney.law

ATTORNEYS FOR PLAINTIFF
DORIS C. BROWN

November 25, 2025
Columbia, South Carolina.